Welch, J.
The arguments in this case have taken a wide range, and counsel have elaborately discussed questions of state policy, morality, and religion, which, in our judgment, do not belong to the case. We are not called upon as a court, nor are we authorized to say whether the Christian religion is the best and only true religion. There is no question before us of the wisdom or unwisdom of having “the Bible in the schools,” or of withdrawing it therefrom. Nor can we, without usurping legislative functions, undertake to decide what religious doctrines, if any, ought to be taught, or where, when, by whom, or to whom it would be best they should be taught. These are questions which belong to the people and to other departments of the government.
The case, as we view it, presents merely or mainly a question of the courts’ rightful authority to interfere in the management and control of the public schools of the state. In other words, the real question is, has the court jurisdiction to interfere in the management and control of such schools, to the extent of enforcing religious instructions, or .the reading of religious books therein ?
Before proceeding to consider this question, however, it should be observed, that if the power be conceded, it would seem only to justify the court in suppressing the first of the *239 .two resolutions in question. The only ground on which counsel attempt to sustain the court in suppressing the second resolution is, that the two resolutions are' so connected and interdependent that they must stand or fall together. But this is by no means true. By suppressing the first resolution, the court simply commands that there shall be some religions instruction, or religions reading in the schools, leaving it entirely to the discretion of the board to say how much and what kind of religious instruction shall be given, and what religious books shall be read, and when read, and whether they shall be read with or without “ appropriate singing.” In perfect consistency with this, the second resolution might be left to stand. That resolution merely repeals the rule requiring stated morning readings, with appropriate singing, at the opening of the schools. On the other hand, if the second resolution is also suppressed, all discretion of the board will be taken away, the rule for morning exercises will be made perpetual, and any board, or member of a board, who should hereafter attempt to modiiy or repeal that rule would be guilty of a contempt of court. As the case stands now, with both resolutions suppressed by the injunction, the board are, in effect., commanded or enjoined, jtirsf, not to withdraw all religious reading and instruction from the schools; and secondly, not to withdraw or discontinue the set morning reading of the Bible with singing. It is easy to see that obedience to the second command or injunction would be obedience to both, because as long as this morning exercise is continued, all religious reading .and instruction is not withdrawn. So far, therefore, from its being true that it is impracticable to enjoin the going into effect of the first resolution, and leave the second resolution in force, the truth is, that it is not only practicable, but that such is the very result that ought to be reached, if we admit the power of the court to interfere in the matter at all. The power of interference is only claimed to the extent of preventing an abuse of the board’s discretion, and not for the purpose of taking away that dis *240 eretion, and thus, so far as concerns religious instruction,, placing the schools under the exclusive and absolute control and supervision of the court. On the theory, therefore, of the court’s rightful authority to interfere to the extent claimed, it seems to us it must be admitted that its injunction suppressing the second resolution, operating, as-it must, to restore and make perpetual the rule requiring the stated morning exercises, is erroneous, and that for this reason the judgment must be reversed.
But.a reversal of the judgment on this ground alone-would by no means end the case. It would still remain,, either for this court, proceeding to render such judgment as the court below should have rendered, or for the court below, upon the cause being remanded, to decide, what I have said was the real question involved, namely, whether the court below had any jurisdiction in the matter. Do the laws of Ohio clothe its courts with power to interfere, either by injunction or mandate, to compel religious instructions and the reading of religious books in the public-schools of the state ?
If this power exists, it must be found in our state or federal constitution, or in statutes of the state enacted in conformity therewith. We know of no law enforceable by courts of the state above or beyond these.
We are referred to no provision of the federal constitution, nor to any enactment of the state legislature, conferring such a power.
Counsel for the. defendants in error, as we understand them, claim to derive this authority of the court from the last clause in section 7, article 1, in connection with section 2, article 6, of the state constitution, which are as follows:
Sec. 7. “All men have a natural and indefeasible right to-worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be-given, by law,'to any religious society ; nor shall any interference with the rights of conscience be permitted. No- *241 religious test shall be required as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious belief; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, hoioever, being essential to-good government, it shall be the duty of the general assembly to• pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and' to encourage schools and the means of instruction.”
“ Sec. 2. The general assembly shall make such provisions., by taxation or otherwise, as, with the income arising from the-school trust fund, will secure a thorough and efficient system of common schools throughout the state; but do religious or other-sect or sects shall ever have any exclusive right to, or control of, any part of the school funds of this state.”
If we rightly comprehend the arguments, it is claimed on-behalf of the defendants in error, (1) that these provisions, in the constitution require and enjoin religious instructions,, or the teaching of religious doctrines in the public schools, irrespective of the wishes of the people concerned therein and (2) that this requirement and injunction rests, not upon-the legislature alone, but, in the absence of legislative action for that purpose, is a law of the state, proprio vigore, binding upon the courts and people.
If it is not conceded, it must be conceded that the legislature have never passed any law enjoining or requiring-religious instructions in the public schools, or giving the courts power in any manner, or to any extent, to direct or-determine the particular branches of learning to be taught therein, or to enforce instructions in any particular branch or branches. The extent of legislative action, either under the present constitution, or under that of 1802, -which contained a provision quite similar to the present, has been,‘to establish and maintain a general system of common schools-for the state, and to place their management and control exclusively in the hands of directors, trustees, or boards of education, other than the courts of the state. The laws/ *242 establishing this system date back to 1825, and form an important part of the legislation of the state They have from time to time been changed, amended, repealed, and re-enacted. While these law's do refer to other branches of learning in the schools, they nowhere enjoin or speak of religious instruction therein. They speak of the “morals” and “good conduct” of the pupils, and of the “moral character” of the teachers, but they nowhere require the pupil to be taught religion, or the teacher to be religious. Much less do they require this to be done against the will of the people interested.
The special laws governing the public schools of the city of Cincinnati are not dissimilar, in this respect, to those of a general nature regulating the common schools of the state. The act of January, 1853 (Disney’s Stat. and Ord. 775), under which the board were acting at the time they .passed the resolutions in question, among other things, provides:
“ That the said trustees and visitors ” (afterward changed -to “ board of education ”) “ shall have the superintendence of "the schools in said city, organized and established under this act, and from time to time shall make such regulations for the government and instruction of'the children therein, as to them shall appear proper and expedient,”..... “and generally do and perform all matters and things pertaining to the duties of their said office, which may be necessary and proper to promote the education, morals, and good conduct of the children instructed in said schools.”
This act requires of teachers in the schools of the city the same certificate that is required by the general law relating to public schools, namely, a certificate of “ competency and good moral character.”
If the clause of the state constitution in question do enjoin the teaching of religious doctrines in the schools, either the law-making power of the state, during the legislation of nearly half a century, have failed so to interpret it, or they have acted in apparent disregard of its requirements. Under the old constitution,.which in fact con *243 tained a more stringent provision on the subject, no legislative action was had for twenty-three years, to enforce instruction in public schools, in any branch of learning; and at no time since has any law been passed to enforce religious instruction therein.
There is a total absence, therefore, of any legislation looking to the enforcement of religious instruction, or the reading of religious books in the public schools; and we are brought back to the question, what is the true meaning and effect of these constitutional provisions on this subject? Do they enjoin religious instructions in the schools? and does this injunction bind the courts, in the absence of' legislation ? "We are unanimous in the opinion that both these questions must be answered in the negative.
The clause relied upon as enjoining religious instructions in the schools declares three things to be essential to good government, and for that reason requires the legislature to encourage “means of instruction” generally, and among other means, that of “schools.” The three things so declared to be essential to good government are “religion, morality, and knowledge.” These three words stand in the same category, and in the same relation to the context; and if one of them is used in its generic or unlimited .sense, so are all three. That the word “ knowledge ” and the word “ morality ” are used in that sense, is very plain. The meaning is, that true religion, true morality, and true knowledge shall be promoted, by encouraging schools and means of instruction. The last named of these three words, “knowledge,” comprehends in itself all that is comprehended in the other two words, “religion” and “ morality,” and which can be the subject of human “ instruction.” True religion includes true morality. All that is comprehended in the word “ religion,” or in the words “religion and morality,” and that can be the subject of human “instructions,” must be included under the general term “knowledge.” Nothing is enjoined, therefore, but the encouragement of means of instruction in general “ knowledge” — the knowledge of truth. The fair interpre *244 tation seems to be, that true “religion” and “morality” are aided and promoted by the increase and diffusion of “knowledge,” on the theory that “knowledge is the hand-maid of virtue,” and that all three — religion,, morality, and knowledge — are essential to good government. But there is no direction given as to what system of general knowledge, or of religion or morals, shall be taught; nor as to what particular branches of suck system or systems shall be introduced into the “schools;” nor is any direction given as to what other “means of instruction” shall be employed, To enjoin “instructions”' in “ knowledge,” the knowledge of truth in all its branches — - religious, moral, or otherwise — is one thing; and to declare-what is truth — truth in any one, or in all departments of human knowledge — and to enjoin the teaching of that, as truth, is quite another thing. To enjoin the latter, would be to declare that human knowledge had reached its ultimatum. This the constitution does not undertake to do, neither as to “religion,” “morality,” nor any other branch or department of human “ knowledge.” And even had it so declared what was to be received and taught as religious-truth, to the exclusion of all else, it would still be necessary,, in order to make the case here claimed, to go further, and show what branches embraced in the injunction are required» to be taught in the schools, and that those to be so taught include the subject of religion.
The truth is that these are matters left to legislative discretion, subject to the limitations on legislative power, regarding religious freedom, contained in the bill of rights; and subject also to the injunction that laws shall be passed, such as in the judgment of the legislature are “suitable” to encourage general means of instruction, including, among other means,, a system of common schools.
Equally plain is it to us, that if the supposed injunction to provide for religious instructions is to be found in the clauses of the constitution in question, it is one that rests-exclusively upon the legislature. In both sections the duty is expressly imposed upon the “ general assembly.” The’ *245 injunction is, to “ pass suitable laws.” Until these “ laws” •are passed, it is quite clear to us that the courts have no power to interpose. The courts can only execute the laws when passed-. They can not compel the general assembly "to pass them.
This opinion might well end here. Were the subject of controversy any other branch of instructions in the schools than religion, I have no doubt it might safely end here, and the unanimous opinion of the court thus rendered be satisfactory to all. The caséis of peculiar importance, however, in the fact that it touches our religious convictions rand prejudices, and threatens to disturb the harmonious working of the state government, and particularly of the public schools of the state. I deem it not improper, therefore, to consider briefly some of the points and matters so ably and elaborately argued by counsel, although really lying outside of the case proper, or only bearing on it remotely.
The real claim here is, that, by “ religion,” in this clause of the constitution, is meant “ Christian religion,” and that by “ religious denomination ” in the same clause is meant “Christian denomination.” If this claim is well founded, I do not see how we can consistently avoid giving a like meaning to the same words and their cognates, “ worship,” “religious society,” “sect,” “conscience,” “religious belief,” throughout the entire section. To do so, it will readily be seen, would be to withdraw from every person not of Christian belief the guaranties therein vouchsafed, and to withdraw many of them from Christians themselves. In that sense the clause of section 7 in question would read .as follows:
“Christianity, morality, and knowledge, however, being essential to good government, it shall be the duty of the .general assembly to pass suitable laws to protect every Christian denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction.”
*246 Nor can I see why, in order to be consistent, the concluding clause of section 2, article 6, should not read as follows: .... “ But no Christian, or other sect or sects, shall ever have any exclusive right to or control of any part of the school funds of the state; but Christians, as a body, including all their sects, may have control of the whole of said funds.”
I do not say that such a reading of the sections in question is literally contended for; and yet I see no fair escape from it, if, the word “ Christianity,” or the words “ Christian religion,” or “ the religion of the Bible,” are to be interpolated, or substituted for the word “religion,” at the place indicated.
If, by this generic word “ religion,” was really meant “ the Christian religion,” or “ Bible religion,” why was it not plainly so written ? Surely the subject was of importance enough to justify the pains, and surely it was of interest enough to exclude the supposition that it was-written in haste, or thoughtlessly slurred over. At the time of adopting our present constitution, this word “ religion ” had had a place in our old constitution for half a century, which was surely ample time for studying its meaning and effect, in order to make the necessary correction or alteration, so as to render it's true meaning definite and certain. The same word “religion,” and in much the same connection, is found in the constitution of the United States. The latter constitution, at least, if not our own also, in a sense, speaks to mankind, and speaks of the rights of man. Neither the word “ Christianity,” “ Christian,” nor “ Bible,” is to be found in either. When they speak of “ religion,” they must mean the religion of man, and not the religion of any class of men. When they speak of “all men” having certain rights, they can not mean merely “all Christian men.” Some of the very men who helped to frame these constitutions wore themselves not Christian men.
We are told that this word “ religion ” must mean “ Christian religion,” because “ Christianity is a part of the- *247 common law of this country,” lying behind and above its constitutions. Those who make this assertion can hardly be serious, and intend the real import of their language. If Christianity is a law of the state, like every other law, it must have a sanction. Adequate penalties must be provided to enforce obedience to all its requirements and precepts. No one seriously contends for any such doctrine in» this country, or, I might almost say, in this age of the world. The only foundation — rather, the only excuse — for the proposition, that Christianity is part of the law of this country, is the fact that it is a Christian country, and that its constitutions and laws are made by a Christian people. And is not the very fact that those laws do not attempt to enforce Christianity, or to place it upon exceptional or vantage ground, itself a strong evidence that they are the. laws of a Christian people, and that their religion is the best and purest of religions? It is strong evidence that their religion is indeed a religion “without partiality,” and therefore a religion “ without hypocrisy.” True Christianity asks no aid from the sword of civil authority. It began, without the sword, and wherever it has taken the sword it has perished by the sword. , To depend on civil authority for its enforcement is to acknowledge its own weakness, which it can never afford to'do. It is able to fight its own battles. Its weapons are moral and spiritual, and not carnal. Armed with these, and these alone, it is not afraid nor “ashamed” to be compared with other religions, and to withstand them single-handed. And the very reason, why it is not so afraid or “ ashamed ” is, that it is not the “ power of man,” but “ the power of God,” on which it depends. True Christianity never shields itself behind majorities. Nero, and the other persecuting Roman emperors,, were amply supported by majorities; and yet the pure and peaceable religion of Christ in the end triumphed over them all; and it was only when it attempted itself to enforce religion by the arm of authority, that it began to wane. A form of religion that can not live under equal and impartial laws ought to die, and sooner or later must die.
*248 Legal Christianity-is a solecism, a contradiction of terms. "When Christianity asks the aid of government beyond mere impartial protection, it denies itself. Its laws are divine, and not human. Its essential interests lie beyond the reach and range of human governments. United with government, religion never rises above the merest superstition ; united with religion, government never rises above the merest despotism; and all history shows us that the more widely and completely they are separated, the better it is for both.
Religion is not — much less is Christianity or any other particular system of religion — named in the preamble to the constitution of the United States as one of the declared objects of government; nor is it mentioned in the clause in question, in our own constitution, as being essential to anything beyond mere human government. Religion is “ essential ” to much more than human government. It is essential to man’s spiritual interests, which rise infinitely above, and are to outlive, all human governments. It would have been easy to declare this great truth in the constitution ; hut its framers would have been quite out of their proper sphere in making the declaration. They contented themselves with declaring that religion is essential to good government; providing for the protection of all in its enjoyment,-each in his own way, and providing means for the diffusion of general knowledge among the people. The declaration is, not that government is essential to good (religion, but that religion is essential to good government. Both propositions are true, but they are true in quite different senses. Good government is essential to religion for the purpose declared elsewhere in the same section of the constitution, namely, for the purpose of mere protection. But religion, morality, and knowledge are essential to .government, in the sense that they have the instrumentalities for producing and perfecting a good form of government. On the other hand, no government is at all adapted for producing, perfecting, or propagating a good religion. Religion, in its widest and best sense, has most, if not all, *249 the instrumentalities for producing the best form of government. Religion is the parent, and not the offspring, of good government. Its kingdom is to be first sought, and good government is one of those things which will be added thereto. True religion is the sun which gives to government all its true lights, while the latter merely acts upon religion by reflection.
Properly speaking, there is no such thing as “ religion of state.” What we mean by that phrase is, the religion -of some individual, or set of individuals, taught and enforced by the state. The state can have no religious opinions; and if it undertakes to enforce the teaching of such opinions, they must be the opinions of some natural person, or class of persons. If it embarks in this business, whose opinion shall it adopt ? If it adopts the opinions of more than one man, or one class of men, to what extent may it group together conflicting opinions ? or may it group together the opinions of all ? And where this conflict exists, how thorough will_ the teaching be ? Will it be exhaustive and exact, as it is in elementary literature and in the sciences usually taught to children ? and, if not, which of the doctrines or truths claimed by each, will be blurred over, and which taught in preference to those in conflict? These are difficulties which we do not have to encounter when teaching the ordinary branches of learning. It is only when we come to teach what lies “ beyond the scope of sense and reason ” — what from its very nature can only be the object of faith — that we encounter these difficulties. Especially is this so when our pupils are children, to whom we are compelled to assume a dogmatical method and manner, and whose faith at last is more a faith in us than in anything else. Suppose the state should undertake to teach Christianity in-the broad sense in which counsel apply the term, or the “ religion of the Bible,” so as also to include the Jewish faith, — where would it begin? .how far. would it go ? and what points of disagreement; would be omitted ?
If it be true that our law enjoins- the teaching of the *250 Christian religion in the schools, surely, then, all its teachers should be Christians. Were I such a teacher, while 1 should instruct the pupils that the Christian religion was true and all other religions false, I should tell them that the law itself was an unchristian law. One of my first lessons to the pupils -would show it to be unchristian. That lesson would be: “ Whatsoever ye would that men should do to’ you, do ye even so to them; for this is the law and the-prophets.” I could not look the veriest infidel or heathen in the face, and say that such a law was just, or that it was a fair specimen of Christian republicanism. I should have-to tell him that it was an outgrowth of false Christianity, and not one of the “ lights ” which Christians are commanded to shed upon an unbelieving world. I should feel bound to acknowledge to him, moreover, that it violates-the spirit of our constitutional guaranties, and is a state religion in embryo; that if we have no right to tax him to-support “ worship,” we have no right to tax him to support religious instructions; that.to tax a man to put down his-own religion is of the very essence of tyranny; that however small the tax, it is a first step in the direction of an “ establishment of religion;” and I should add, that the-.first step in that direction is the fatal step, because it logically involves the last step.
But it will be asked, how can religion, in this general sense, be essential to good government ? Is atheism, is the-religion of Buddha, of Zoroaster, of Lao-tse, conducive to-good government ? Does not the best government require-the best religion ? Certainly the best government requires-the best religion. It is the child of true religion, or of truth on the subject of religion, as well as on all other subjects. But the real question here is, not what is the best, religion, but how shall this best religion be secured ? I answer, it can best be secured by adopting the doctrine of this 7th section in our own bill of rights, and which I summarize in two words, by calling it the doctrine of “ hands-off.” Let the state not only keep its own hands off, but let it also see to it that religious sects keep their hands off’ each- *251 other. Let religious doctrines have a fair field, and a free, intellectual, moral, and spiritual conflict. The weakest — that is, the intellectually, morally, and spiritually weakest — will go to the wall, and the best will triumph in the-end. This is the golden truth which it has taken the world eighteen centuries to learn, and which has at last solved the terrible enigma of “ church and state.” Among the-many forms of stating this truth, as a principle of government, to my mind it is nowhere more fairly and beautifully-set forth than in our own constitution. "Were it in my power, I would not alter a syllable of the form in which it is there put down. It is the true republican doctrine. It is simple and easily understood. It means a free conflict, of opinions as to things divine; and it means masterly inactivity on the part of the state, except for the purpose of keeping the conflict free, and preventing the violation of private rights or of the public peace. Meantime, the state will impartially aid all parties in their struggles after religious truth, by providing means for the increase of general knowlege, which is the handmaid of good government, as well as of true religion and morality. It means that a man’s right to his own religious convictions, and to impart them to his own children, and his and their right to engage, in conformity thereto, in harmless acts of worship toward the Almighty, are as sacred in the eye of the law as his rights of person or property, and that although in the minority, he shall be protected in the full and unrestricted enjoyment thereof. The “ protection ” guarantied by the section in question, means protection to the minority. The majority can protect itself. Constitutions are enacted for the very purpose of protecting the weak against the strong; the few against the many.
As with individuals, so with governments, the most valuable truths are often discovered late in life; and when discovered, their simplicity and beauty make us wonder that we had not known them before. Such is the character and history of the truth here spoken of. At first sight it seems to lie deep ; but on close examination we find it to be only *252 a new phase or application of a doctrine with which true religion everywhere abounds. It is simply the doctrine of conquering an enemy by kindness. Let religious sects adopt it toward each other. If you desire people to fall in love with your religion, make it lovely. If you wish to put down a false religion, put it down by kindness, thus heaping coals of fire on its head. You can’t put it down by force ; that has been tried. To make the attempt, is to put down your own religion, or to abandon it. . Moral and spiritual conflicts can not be profitably waged with carnal weapons. When so carried on, the enemy of truth and right is too apt to triumph. Even heathen writers have learned and taught this golden truth. Buddha says : “ Let a man overcome anger by love, evil by good, the greedy by liberality, and the slanderer by a true and upright life.” Christianity is full of this truth, and, as a moral code, might be said to rest upon it. It is in hoc signo, by the use of such weapons, that Christianity must rule, if it rules at all.
We are all subject to prejudices, deeper and more fixed on the subject of religion than on any other. Each is, of course, unaware of his own prejudices. A change of circumstances often opens our eyes. No Protestant in Spain, and no Catholic in this country, will be found insisting that the government of his residence shall support and teach its own religion to the exclusion of all others, and tax all alike for its support. If it is right for one government to do so, then it is right for all. Were Christians in the minority here, I apprehend no such a policy would be thought of by them. This is the existing policy of most governments in the world. Christian countries, however, are fast departing from it — witness Italy, Prussia, Spain, England. The true doctrine on the subject is the doctrine of peaceful disagreement, of charitable forbearance, and perfect impartiality. Three men — say, a Christian, an infidel, and a Jew — ought to be able to carry on a government for their common benefit, and yet leave the religious doctrines and worship of each unaffected thereby, otherwise than by fairly and impartially protecting each, and aiding each in his *253 searches after truth. If they are sensible and fair men,, they will so carry on their government, and carry it on successfully, and for the benefit of all. If they are not sensible and fair men, they will he apt to quarrel about religion, and, in the end, have a bad government and bad religion, if they do not destroy both. Surely, they could well and safely carry on any other business, as that of banking, without involving their religious opinions, or any acts of religious worship. Government is an organization for particular purposes. It is not almighty, and we are not to look to it for everything. The great bulk of human affairs and human interests is’left by any free government to individual" enterprise and individual action. Religion is eminently one of these interests, lying outside the true and legitimate province of government.
Counsel say that to withdraw all religious instruction-from the schools would' be to put them under the control of “ infidel sects.” This is by no means so. To teach the doctrines of infidelity, and thereby teach that Christianity is false, is one thing; and to give no instructions on the-subject is quite another thing. The only fair and impartial - method, where serious objection is made, is to let each sect give its own instructions, elsewhere than in the state-schools, where of necessity all are to meet; and to put disputed doctrines of religion among other subjects of instruction, for there are many others, which can more conveniently, satisfactorily, and safely he taught elsewhere. Our charitable, punitive, and disciplinary institutions stand on an-entirely different footing. There the state takes the place of the parent, and may well act the part of a parent or guardian in directing what religious instructions shall be given.
The principles here expressed are not new. They are the same, so far as applicable, enunciated by this court in Bloom v. Richards, 2 Ohio St. 387, and in McGatrick v. Wason, 4 Ib. 566. They are as old as Madison, and were his favorite opinions. Madison, who had more to do with framing the constitution of the United States than any other man, and - *254 whose purity of life and orthodoxy of religious belief no one questions, himself says :
“ Religion is not within the purview of human government.” And again he says: “ Religion is essentially distinct from human government, and exempt from its cognizance. A connection between them is injurious to both. There are causes in the human breast which insure the perpetuity of religion without the aid of law.”
In his letter to Governor Livingston, July 10, 1822, he says: “ I .observe with particular pleasure the view you have taken of the immunity of religion from civil government, in every case where it does not trespass on private rights or the public peace. This has always been a favorite •doctrine with me.”
I have made this opinion exceptionally and laboriously long. I have done so in the hope that I might thereby aid in bringing about a harmony of views and a fraternity of feeling between different classes of society, who have a common interest in a great public institution of the state, which, if managed as sensible men ought to manage it, I have no doubt, will be a principal instrumentality in working out for us what all desire — the best form of government .and the purest system of religion.
I ought to observe that, in our construction of the first named of the two resolutions in question, especially in the light of the answer of the board, we do not understand that .any of the “ readers,” so called, or other books used as mere lesson-books, are excluded from the schools, or that any inconvenience from the necessity of procuring new books will be occasioned by the enforcement of the resolutions.
It follows that the judgment of the Superior Court will be reversed, and the original petition dismissed.

Judgment accordingly.